UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-225(5) (NEB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S POSITION** |
| v. | ) | **REGARDING SENTENCING** |
| | ) | |
| MUSTAFA JAMA, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Matthew C. Murphy and Rebecca E. Kline, Assistant United States Attorneys, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 16 months in prison.

Defendant Mustafa Jama's siblings, Sharmake and Ayan Jama, owned and operated Brava Restaurant, located in a retail strip mall in Rochester, Minnesota. Jama began working at the restaurant in 2019, shortly before Brava Restaurant enrolled as a Federal Child Nutrition Program food distribution site under the sponsorship of Feeding Our Future. Beginning in September 2020 and continuing until approximately December 2021, Brava Restaurant fraudulently claimed to be serving approximately 3,000 breakfasts and lunches to children, seven days a week. Over that period, Brava Restaurant submitted fake meal counts claiming to have served more than 1.7 million meals to children in Rochester, Minnesota. In reality, Brava Restaurant served only a tiny fraction of the claimed meals. As a result of those

fraudulent claims, Brava Restaurant was paid over $5.3 million in Federal Child Nutrition Program funds.

Jama's role in the scheme initially was limited to distributing meals Brava Restaurant actually prepared. Then, on January 7, 2021, Jama and his co-defendants each registered a shell company for the purpose of laundering Brava Restaurant's fraud proceeds. Jama's shell company was called Nakamud LLC. In 2021, Jama received approximately $1,429,730 in fraud proceeds from Brava Restaurant, which he deposited into the Nakamud LLC bank account he controlled with codefendant Ayan Jama. Jama used the fraud proceeds towards the purchase of homes in Columbus, Ohio, and Lakeville, Minnesota, as well as a Mediterranean coastal property in Alayna, Turkey.

Jama was indicted on September 13, 2022, with one count of conspiracy to commit money laundering and two counts of money laundering. He pled guilty to one count of money laundering on February 6, 2025.

## SENTENCING RECOMMENDATION

In *Gall v. United States*, the Supreme Court set forth the appropriate sentencing methodology. 552 U.S. 38, 49–50 (2007). The district court should first calculate the advisory Sentencing Guidelines range. *Id*. at 49. After calculating a defendant's advisory Sentencing Guidelines range and hearing from the parties, the district court must then consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and make an individualized assessment based on the facts in arriving at an appropriate sentence. *Id*. at 49–50; *see also United States v. Ruvalcava-Perez*, 561

F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

## A.  Sentencing Guidelines Range

The base offense level for money laundering is 8 pursuant to Guidelines § 2S1.1(a)(2). (PSR ¶ 66.) The base offense level is increased by 14 levels pursuant to Guidelines § 2B1.1(b)(2)(h) because the defendant is responsible for laundering more than $550,000 but less than $1,500,000. (PSR ¶ 66.) The offense level is increased by another 1 level pursuant to Guidelines § 2S1.1(b)(2)(A) because the defendant was convicted under 18 U.S.C. § 1957. (PSR ¶ 67.) As explained in its objections to the PSR, the government believes the defendant is entitled to the minimal participant role adjustment contemplated by the parties in the plea agreement, and that the offense level should be decrease by 4 levels pursuant to Guidelines § 3B.1.2(a), rather than the 2-level reduction called for in the PSR. (PSR ¶ 69.) The total adjusted offense level is decreased another 3 levels pursuant to Guidelines § 3E1.1(a) and (b) because the defendant accepted responsibility in a timely manner. (PSR ¶¶ 73-74.) The defendant also is entitled to a 2-level reduction because he meets the zero-point offender criteria set forth in Guidelines § 4C1.1(a). (PSR ¶ 72.) The defendant falls into Criminal History Category I. (PSR ¶ 78.) With a total adjusted offense level of 14, and a Criminal History Category I, the defendant's advisory Guidelines range is 15 to 21 months in prison.

**B.      Section 3553(a) Sentencing Factors**

Section 3553(a) requires the Court to analyze several factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

**1.      Nature and Circumstances of the Offense**

Jama participated in one of the largest fraud schemes in the history of the District of Minnesota, and the single largest Covid-19 fraud scheme in the country. He took money intended to feed children who no longer could get regular, nutritious meals at school, and used it to enhance his lifestyle, including purchasing homes in Columbus, Ohio, Lakeville, Minnesota, and Alayna, Turkey. He knew he was not entitled to the money and that it was obtained by lying to the government about the number of children his family allegedly served meals to at their Rochester restaurant. Simply put, he took advantage of a once-in-a-century global pandemic and the generosity of American taxpayers to enrich himself.

**2.      History and Characteristics of the Defendant**

Jama was born in Somalia in 1977. His father was killed in the Somali civil war in 1991, and Jama fled with his mother and siblings to Kenya. Jama lived several years in a refugee camp in Kenya, before emigrating with his mother and siblings to Minnesota in 1997. His family settled in Owatonna, where he dropped out of high school to work to support his family. In 2001, Jama moved to Columbus, Ohio, where

4

he worked as an airport shuttle bus driver. He married in 2004 and had a daughter shortly after. Jama divorced his first wife in 2006 but remarried in 2017. He is currently in the process of divorce again.

Jama moved back to Rochester, Minnesota, in 2019 and began working at the family restaurant. Following his indictment in this case, Jama has worked intermittently for Geotek, a fiberglass product manufacturer based in Stewartville, Minnesota. Jama did not complete high school.

**3.     Deterrence, Respect for the Law, Just Punishment, and Protecting the Public**

The Court must also consider the need for the sentence to afford adequate deterrence, promote respect for the law, provide just punishment, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a).

Jama's crime must be viewed in context of the rampant fraud that has plagued Minnesota in recent years. Unprecedented levels of fraud perpetrated on public benefits programs in Minnesota have eroded trust in the government and raised questions about the sustainability of those programs. Too many people, Jama included, participate in this kind of fraud because, as they see it, everyone else is doing it. This cynical view must be stopped. It has undermined and endangered important government programs as well as legitimate nonprofit organizations that rely on donations to carry out actual charitable work. Would-be fraudsters must understand that there are serious consequences for their actions. Until the risks of

stealing from the public fisc outweigh the potential reward, fraud in Minnesota will continue.

### 4.      The Need to Avoid Unwanted Disparities

Finally, the Court must consider the need to avoid unwarranted disparities. 18 U.S.C. § 3553(a). As noted in the PSR, 88 percent of defendants sentenced within the past four years under the same Guidelines provision, with the same offense level and criminal history as Jama, received a sentence of imprisonment. Those who were imprisoned received an average sentence of 14 months. Considering the amount of money Jama laundered is closer to the upper threshold of the § 2B1.1 loss table, a sentence above the average for his Judiciary Sentencing Information cohort is warranted. The Court recently sentenced Jama's codefendants and sisters, Zamzam and Asha Jama, to six months' imprisonment for similar criminal conduct. Both Zamzam and Asha laundered significantly less money than Jama, however, and so a sentence greater than 6 months is warranted.

### CONCLUSION

For the reasons stated above, the government respectfully requests that the Court impose a sentence of 16 months in prison.

Respectfully Submitted,

Dated: June 24, 2026,                DANIEL N. ROSEN
                                     United States Attorney

                                      /s/ *Matthew C. Murphy*
                              BY:   MATTHEW C. MURPHY
                                     REBECCA E. KLINE
                                     Assistant U.S. Attorneys

6